# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-2313
_____

United States of America

*Plaintiff - Appellee*

v.

Todd Aaron Howard Hamilton Sutton, Jr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Central

_____

Submitted: April 15, 2026
Filed: August 5, 2026

_____

Before GRUENDER, BENTON, and ERICKSON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Todd Sutton, Jr. was arrested for driving with a suspended license, taken to jail, and visually strip-searched pursuant to jail policy. During the strip search, officials discovered a plastic bag containing methamphetamine tucked beneath his genitals. Sutton was indicted for possession of methamphetamine with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B). Sutton moved to suppress the

evidence obtained during the strip search. The district court[1] denied his motion. Sutton entered a conditional guilty plea and now appeals. We affirm the denial of Sutton's motion to suppress.

## I. Background

In the early hours of July 27, 2024, an Iowa Sheriff's deputy arrested Sutton for driving with a suspended license, which is an aggravated misdemeanor in Iowa. The deputy then transported him to the Cerro Gordo County Jail, where the deputy initiated the routine booking process at around 4:00 a.m., which included informing Sutton that the uniform bail schedule set bail at $2,000 for his aggravated misdemeanor charge. The deputy also told Sutton that he could use a bail bondsman and that a bondsman would likely charge $300 to $500 to cover his bail. Sutton, who possessed $433 in cash, stated that he did not want to work with a bondsman and would rather pay $400 directly to leave jail. The deputy explained to Sutton that he would have to work with a bondsman because he did not have $2,000, but he also told Sutton that he may be able to avoid using a bondsman if he waited for his initial appearance, which the deputy predicted would take place that morning at around 10:00 a.m. Sutton did not clarify which option he preferred and began making phone calls, although it was not clear to the deputy whether he reached anyone. Seeing no progress, and given the time of the morning, the deputy eventually turned Sutton over to officials at the county jail for intake.

Jail officials intended to place Sutton in one of the two dormitory cells in the intake section of the jail. The intake dormitories are communal holding cells that each hold up to ten individuals. As Sutton had been cooperative, jail officials intended to place Sutton in an intake dormitory cell with two other detainees rather

---

[1]The Honorable Leonard T. Strand, United States District Judge for the Northern District of Iowa, adopting the report and recommendation of the Honorable Kelly K.E. Mahoney, Chief Magistrate Judge, United States District Court for the Northern District of Iowa.

than an individual holding cell. Uncooperative inmates are assigned to other cells as the jail officials deem appropriate.

Because Sutton had been arrested for at least a serious misdemeanor, jail policy required officials to conduct a visual strip search before placing him in an intake dormitory.[2] During such a search, one or more officials of the same sex as the detainee visually inspect his or her naked person in a designated shower room, but do not touch the detainee. The search is not recorded, and only the searching officials are able to observe the detainee.

Officials strip-searched Sutton. As required by jail policy, an officer ordered him to lift his genitals. After he had done so, officers observed a wrapped plastic bag containing white powder tucked between his genitals and buttocks. The officials ordered Sutton to remove the bag and hand it to them, which ultimately, he did. The officers placed the plastic bag into an evidence bag, then handed it over to the arresting deputy. A search of the bag's contents revealed it contained methamphetamine, and Sutton was indicted for possession of methamphetamine with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B). Sutton moved before a magistrate judge to suppress the plastic bag as the fruit of an illegal search under the Fourth Amendment. The magistrate judge issued a report recommending denial of Sutton's motion, which the district court adopted over Sutton's objection. Sutton then entered a conditional guilty plea to the charge of possession with intent to distribute that reserved his right to appeal the denial of his motion to suppress. *See* Fed. R. Crim. P. 11(a)(2). This appeal follows.

## II. Analysis

"In reviewing a denial of a motion to suppress, this court reviews factual findings for clear error, and legal conclusions de novo." *United States v. Williams*,

---

[2]Although individuals arrested for simple misdemeanors also may be placed in the intake dormitory, the jail does not strip-search those detainees absent probable cause to believe they are concealing an item.

521 F.3d 902, 905 (8th Cir. 2008). "The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citation modified). "Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (citation modified). Here, we evaluate only whether the officials' visual strip search of Sutton, and not the jail's overall strip-search policy, violated the Fourth Amendment. *See United States v. Allison*, 619 F.2d 1254, 1258 (8th Cir. 1980) (explaining that the Fourth Amendment protects "personal rights" and "may be enforced by the exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure" (quoting *Simmons v. United States*, 390 U.S. 377, 389 (1968))); *see also Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("[O]nly defendants whose Fourth Amendment rights have been violated [can] benefit from the [exclusionary] rule's protections.").

The Supreme Court has held that the Fourth Amendment does not categorically prohibit strip searches of detainees who will be housed with the general jail population. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322-23 (2012). In *Florence*, the Supreme Court considered a § 1983 class action brought on behalf of detainees in New Jersey jails who were charged with nonindictable offenses and strip-searched like Sutton pursuant to jail policy. *Id.* at 324. The Court rejected the detainees' challenge to the policy under the Fourth Amendment, noting that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 328. Thus, "deference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated." *Id.* at 330 (citation modified). The Court—focusing on the fact that the detainee plaintiffs were to be held with the jail's general population—found that such a showing had not been made. *Id.* at 323. It outlined the many security concerns that justify officials' "ability to conduct searches without predictable exceptions," *id.* at 327-28, including: preventing the smuggling of

prohibited items, *id.* at 327, preventing the introduction of lice and contagious infections, *id.* at 330-31, and discovering tattoos and other signs of gang affiliation. *Id.* at 331. The Court also noted that new detainees entering the general population—even those arrested for only minor offenses—present a particular smuggling risk, *id.* at 335-36, and emphasized that jail officials have an "essential interest in readily administrable rules," *id.* at 338.

Here, we must address whether jail officials could strip-search Sutton without reasonable suspicion or probable cause because he would be held in an intake dormitory alongside other detainees. Sutton accurately notes that *Florence* did not settle conclusively whether "those arrested for minor offenses . . . [who may be] released from custody prior to or at the time of their initial appearance before a magistrate" may always be strip-searched "absent reasonable suspicion." *See id.* at 340-41 (Alito, J., concurring). Nonetheless, like the detainees in *Florence*, Sutton was entering a jail facility where he would have relatively unrestricted contact with other detainees, posing "risks for facility staff, for the existing detainee population, and for [himself]." *Id.* at 330. Accordingly, we apply the deferential "substantial evidence" framework outlined in *Florence* and affirm the district court's holding that the officers' strip search did not violate Sutton's Fourth Amendment rights.

Resisting this conclusion, Sutton argues that (1) we should not apply the *Florence* standard here and (2) regardless, he has met that standard because substantial record evidence shows that the strip search was unnecessary and unjustified. We reject both arguments.

Sutton makes two arguments for why *Florence* is inapplicable to this case. First, Sutton argues that we should distinguish the intake dormitory because it is "transitional" and "much more temporary" than the general population housing at issue in *Florence*. We are unpersuaded. Like the general population facilities in *Florence*, the intake dormitory in which Sutton was to be placed housed other detainees in a space where they may easily pass contraband or commit violence against each other. *See id.* at 327, 331. Because Sutton was likely to "share[] a cell

-5-

with at least one other person and interact[] with other inmates following . . . admission to the jail," *see id*. at 323, the jail officials' interest in securing Sutton pursuant to easily administrable rules was as strong as that of the jail officials in *Florence*. *See id*. at 338. Jail officials also expected Sutton to remain in the intake dormitory for at least several hours. As the Government points out, this timeframe would have provided sufficient opportunity for the exchange of contraband, the spread of disease, or an outbreak of violence. Thus, the transitory nature of Sutton's detention in the intake dormitory does not sufficiently differentiate his detention from those of the *Florence* plaintiffs.

Second, Sutton argues that *Florence* is inapposite because jail officials strip-searched him even though they planned to house him with just two other detainees, not the general jail population. In support of his position, he relies on a single Tenth Circuit decision that concluded that a visual strip search of an arrested suspect violated the Fourth Amendment. *See Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204 (10th Cir. 2020). In that case, however, jail officials strip-searched a suspect, who happened to be a former Chief of Police, even though there had been "no determination . . . regarding how [he] was going to be classified or where he would be housed." *Id*. at 1236-37. And when a housing determination was eventually made, the same officials elected to place the suspect in a segregated unit because he was a former police officer. *Id.* at 1237. Accordingly, the Tenth Circuit found that *Florence* did not apply because the officials had "set the cart before the horse" in strip-searching a suspect before determining that he would be housed with other detainees. *Id.* at 1237-38. As Sutton acknowledges, however, the circumstances around his detention were different. Specifically, the district court found that jail officials had already decided to house him in an intake dormitory with two other detainees *prior to* conducting their search. Because Sutton has failed to show why such a finding was clearly erroneous, *see United States v. Sainz Navarrete*, 955 F.3d 713, 720 (8th Cir. 2020), we reject his assertion that *Hinkle* is apposite. On the contrary, we reiterate that the record indicates that the same safety concerns that underpinned the Court's reasoning in *Florence* existed when jail officials elected to visually strip-search Sutton.

Therefore, *Florence* controls and unless the record contains substantial evidence showing jail officials' decisions were unnecessary or unjustified, we must "defer to the judgment of correctional officials" and find that the search was reasonable. *Florence*, 566 U.S. at 322-23. The record does not support that showing.[3]

Sutton first contends that the strip search was unnecessary and unjustified because the jail could have easily placed him in an individual holding cell rather than an intake dormitory. But the record does not support this. *See Florence*, 566 U.S. at 323. For one, we do not know whether the individual holding cells were occupied when Sutton arrived at the jail. Moreover, there is no evidence in the record, much less substantial evidence, that the jail's decision to distinguish between cooperative and uncooperative detainees is unnecessary or unjustified. The jail has only four individual intake holding cells while twenty people can be held in its intake dormitories. Common sense supports that uncooperative inmates are more likely to pose a threat to others. And Sutton fails to point to record evidence indicating that keeping these cells available for detainees who need to be isolated from other detainees was unnecessary or unjustified. He also cites no policy, practice, or legal authority that would have required jail officials to place him in an individual holding cell. This argument thus fails.

Sutton also contends that the policy itself shows that the search was unjustified because jail policy does not require a strip search of detainees arrested for simple misdemeanors, even if those detainees will enter an intake dormitory. Sutton argues the policy is therefore not tailored to the concerns identified in *Florence* and

---

[3]Sutton raised at oral argument that *Florence*'s deferential framework should not apply in a criminal case where the Government bears the ultimate burden of proof. But this argument never appears with specificity in Sutton's brief. *See United States v. Sigillito*, 759 F.3d 913, 936 (8th Cir. 2014) (requiring specificity for presentation of an issue). "We do not consider arguments made for the first time at oral argument." *United States v. Larison*, 432 F.3d 921, 923 n.3 (8th Cir. 2006). Therefore, we do not reach this argument.

therefore cannot be a necessary or justified response to those concerns. He notes that *Florence* rejected the premise that "officers can identify as a general matter individuals who should not be subject to a search." *Florence*, 566 U.S. at 334. There are two problems with this argument. First, the *Florence* standard requires substantial evidence in the record that the jail's response was *unnecessary or unjustified*—not that it was under- or over-inclusive. *Id*. at 322-23. Even if the policy is not perfectly tailored, the jail's decision not to strip-search those suspected of less serious crimes is not substantial evidence that strip-searching Sutton was unnecessary or unjustified. Second, as we have explained, the question before us is only whether jail officers subjected Sutton to a strip search that violated the Fourth Amendment. We need not and therefore do not decide whether every search required or permitted by the policy complies with the Fourth Amendment.[4]

Sutton objects that our conclusion swallows the exception *Florence* left open for detainees who will not be held with others. We disagree. Like the *Florence* Court, we have "le[ft] open the possibility" of exceptions, *id*. at 340 (Roberts, C.J., concurring), but simply determined that Sutton's case does not warrant one based on the record before us. In doing so, we have stayed faithful to the Supreme Court's caution to proceed gradually in this context and address each factual situation as it arises. *See Florence*, 566 U.S. at 339.

### III. Conclusion

For the foregoing reasons, we affirm the denial of Sutton's motion to suppress.

_____

---

[4]The *Florence* Court addressed the constitutionality of the strip-search policy generally because the case was brought as a class action. *Florence*, 566 U.S. at 328, 324. Class actions necessarily present common questions that must yield common answers. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). Whether the policy of the New Jersey jails violated the Fourth Amendment was the common question in that case. Here, Sutton is the only party seeking relief.